# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2370 | **DATE** | 7/23/2004 |
| **CASE TITLE** | Mangus vs. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the attached Memorandum Opinion and Order, the Commissioner's motion for summary judgment (doc. # 14) is denied and Mr. Mangus's motion for summary judgment (doc # 11) is granted. This case is remanded pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUL 28 2004 | 15 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | JXM | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| mm7 | courtroom deputy's initials | | date mailed notice | |



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DENNIS MANGUS, )
)
Plaintiff, )
) No. 03 C 2370
vs. )
) Magistrate Judge Schenkier
JO ANNE B. BARNHART, )
COMMISSIONER OF )
SOCIAL SECURITY, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

The plaintiff, Dennis Mangus, seeks judicial review of a final decision denying his application for disability insurance benefits, under 42 U.S.C. § 405(g) of the Social Security Act (the "Act"). On October 1, 2001, Mr. Mangus applied for a period of disability and disability insurance benefits ("DIB") for alleged disorders of the back (discogenic and degenerative) (R. 64), with an onset date of November 1, 2000. An administrative hearing was held before the Administrative Law Judge (the "ALJ") on July 2, 2002, during which Mr. Mangus, a medical expert ("ME") and a vocational expert ("VE") testified regarding his alleged back disorders (R. 24-63). Mr. Mangus's claim was denied by written decision of the ALJ on August 1, 2002 (R. 11-18). Mr. Mangus then brought a request for review before the Social Security Administration Appeals Council on September 26, 2002, which included new evidence submitted by his attorney (R. 7). The council denied the request for review on March 10, 2003 (R. 4-6). The ALJ's decision therefore became the final decision of the Commissioner.



Mr. Mangus filed a timely complaint for administrative review before this Court on April 7, 2003. The parties now have filed cross motions for summary judgment: Mr. Mangus seeks reversal or remand of the Commissioner's decision (doc. # 11), and the Commissioner seeks a judgment affirming the decision (doc. # 14). For the reasons set forth below, the Court denies the Commissioner's motion for summary judgment, and grants Mr. Mangus's summary judgment motion seeking a remand.[1]

## I.

The following facts are taken from the administrative record, the administrative hearing transcript, and the ALJ's written decision. The Court will first discuss Mr. Mangus's personal and medical history. Next, the Court will summarize the hearing testimony and the ALJ's written decision.

### A.

Mr. Mangus is 53 years old and is married (R. 30). He lives with his wife and step-daughter (R. 38). Mr. Mangus has completed 8-1/2 years of education and can read and write (R.30). Prior to filing for disability, Mr. Mangus worked as a recycler from August 1991 to December 1992 and as a water meter reader from January 1994 to August 1997 (R. 104). Mr. Mangus has not been employed since August 1997, but he has worked as a homemaker during that time (R. 31).

Mr. Mangus testified that the pain in his back began bothering him while he worked as a recycler (using an end loader), between August 1991 and December 1992 (R. 33). In August 1997, soon after he lost his job as a water meter reader, Mr. Mangus's back pain began to intensify (R. 33).

---

[1] On July 30, 2003, this case was reassigned to this Court after the parties consented to have all proceedings in this case conducted by this Court, including entry of final judgment, pursuant to 28 U.S.C. § 636(c) (doc. ## 7-9).


On November 13, 2000, Mr. Mangus went to see Dr. Cichowicz, a naprapath,[2] who treated Mr. Mangus with hot packs, electrical muscle stimulation, and naprapathic manipulation (R. 140). Dr. Cichowicz' treatment decreased Mr. Mangus's pain for short periods of time, but the pain returned upon extended periods of sitting (R. 140). As a result, Dr. Cichowicz referred Mr. Mangus to an orthopedist (R. 140).

Dr. Brackett, an orthopedic surgeon, began seeing Mr. Mangus in August 2001 (R. 147). On August 22, 2001, Mr. Mangus went to the emergency room at MacNeal Hospital, complaining of back pain; he was diagnosed with sciatica and given Vicodin (R. 15). In September 2001, Mr. Mangus underwent an MRI (R. 150), which showed degenerative disc disease at L5-S1 with a small extruded fragment and disc bulges at L3-4 and L4-5 (R. 15). Mr. Mangus visited Dr. Brackett almost monthly from August 2001 through January 2002 (R. 145); during this time period, Mr. Mangus perceived that his back pain lessened (R. 145-46).

## B.

At the administrative hearing, Mr. Mangus testified that he has not done any work for which he has been paid since November 1, 2000, his alleged onset date (R. 31). Mr. Mangus testified that he lost his last job as a water meter reader in 1997 because he stopped making political contributions (R. 32), although the reason given to him by the City of Berwyn was that he was unable to do the work (R. 12). Prior to working for Berwyn, Mr. Mangus worked for Waste Management in Cicero, where he worked as a recycler, operating an end loader (R. 32). Mr. Mangus testified that at this job

---

[2]Naprapathy refers to "[t]reatment of disease by manipulation of joints, muscles, and ligaments, based on the belief that many diseases are caused by displacement of connective tissues." AMERICAN HERITAGE DICTIONARY 1168 (4th Ed. 2000).

3

he had to do some lifting from time to time, including lifting over twenty pounds[3] (R. 32-33). Mr. Mangus's job with Waste Management ended in December 1992 because his back began bothering him, although he did not know he had a back problem at the time because the pain was not as persistent (R. 33). After the Berwyn job ended in August 1997, Mr. Mangus did not look for work because he "really . . . started having trouble with [his] back" (R. 33). He did not seek employment outside the home after leaving that job.

Mr. Mangus testified that he has current health problems which would interfere with working. These problems include pain in his back and right leg (R. 34). For example, Mr. Mangus testified that his right leg is half numb and certain movement, such as turns of the leg, causes a "jabbing pain" in his back (R. 34). Mr. Mangus testified that he is able to sit for forty to forty-five minutes at most before he needs to walk again (R. 35). After walking for ten to fifteen minutes, he then can resume sitting for another thirty minutes (R. 35). Mr. Mangus indicated similar problems with standing (R. 35).

When the ALJ asked Mr. Mangus how far he can walk, Mr. Mangus testified that he is able to walk his dog about one block three times per week, at most (R. 35). Climbing stairs is difficult for him, and although he is able to bend at the knees, if he stoops to his feet, he cannot stand up again because his right leg has grown weak; he does not bend at the back (R. 36). Mr. Mangus testified that in May 2002 he hurt his back while cutting the grass (R. 36). When the ALJ asked if Mr. Mangus could lift twenty pounds, Mr. Mangus answered that, although he does the laundry (R. 39),

---

[3]During cross-examination by this attorney, Mr. Mangus revealed that, while working as a meter reader, he occasionally lifted 100 pounds (R. 40). He also had to do some climbing and crawling (R. 41).

he does not carry a basket of laundry, which he thinks is less than twenty pounds, because he thinks this activity might hurt his back (R. 37).

Mr. Mangus testified that he keeps his daily routine simple because his back feels different depending upon what activity he does (R. 41). Mr. Mangus's day-to-day activities include watching television and planning the evening meal (R. 40). Mr. Mangus is also able to tend to his personal hygiene (R. 38); fix minor things around the house (R. 39); and drive, although he uses both feet because his right leg is numb and he fears his right foot will not respond quickly enough in an emergency (R. 42). Additionally, he drives to do grocery shopping but is unable to sit long enough to drive long distances (R. 43). He recently purchased a cane, although he has not used it (R. 44).

The ALJ then questioned Mr. Mangus about his medical history. Mr. Mangus testified that his medications include Zocor for cholesterol, Vasotec for blood pressure, and Darvocet for his back, when needed (R. 37). With respect to actual use, Mr. Mangus indicated that he had not taken Darvocet in "six weeks to a month" (R. 37), but he periodically takes Aleve (R. 37).

Mr. Mangus has been seeing Dr. Brackett for his back problems (R. 37-38). He testified that he had not had any testing done since an MRI, taken in September 2001 (R. 38). Mr. Mangus testified that Dr. Brackett recommended surgery after the MRI, but Mr. Mangus declined to have surgery because he was apprehensive about the risks of not being able to walk and being confined to a wheelchair (R. 40). Mr. Mangus indicated, however, that he knows that back surgery is not "a matter of if; it is a matter of when" (R. 40).

## C.

At the administrative hearing, the ALJ gave a Medical Examiner ("ME") from the Social Security Administration ("SSA") permission to question Mr. Mangus about his physical condition

(R. 48-52). The ME asked Mr. Mangus about his medications; when Mr. Mangus last had taken Darvocet; whether Mr. Mangus had been prescribed a back brace; and about the numbness in Mr. Mangus's leg (R. 49-50). Mr. Mangus told the ME that Dr. Brackett prescribed Darvocet for back pain, but that he has not needed to take one in six weeks (R. 49). Mr. Mangus also indicated that he bought a back support, even though no one has prescribed a back support (R. 50). Mr. Mangus indicated that his leg was numb in patches (R. 50).

After the ME finished his examination, the ALJ and Mr. Mangus's attorney questioned the ME about his conclusions regarding Mr. Mangus's physical condition (R. 52-56). The ME said that Mr. Mangus has "established Degenerative Disk Disease of the lumbar spine, as evidenced by the MRI, which showed L-2, L-3, L-4-5, L-5, S-1" (R. 53). The ME testified that "this manifests itself particularly with neurological findings at L-5, S-1 in the form of absent right ankle jerk" (R. 53). The ME also indicated that Mr. Mangus has one half-inch atrophy of the right calf and continued numbness in the fifth toe (R. 53). He indicated that Mr. Mangus's pain is "valid" because it is "within the dermatomal patterns for L-5, S-1" (R. 53). The ME testified that Mr. Mangus's condition meets the impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04 ("Listing 1.04") (R. 53-54).

After the ME testified that Mr. Mangus's condition "meets" Listing 1.04 "[b]ased on the objective medical evidence," the following exchange between the ALJ and the ME took place:

> Q   And to what extent did the testimony at the hearing play a role in your reaching that conclusion?
> A   It played a role in that if I have . . . a gentleman with an asymptomatic herniated disk with these findings, no pain, he certainly could work. But coupled with the pain he's having and looking at him, he's in discomfort.

6

(R. 54). The ALJ then asked the ME for an RFC assessment on the assumption that Mr. Mangus did not have an impairment that met or equalled Listing 1.04 (R. 54), which the ME provided (R. 54-55). In so doing, the ME cited to an RFC assessment prepared by Dr. Robert Patey on December 5, 2001, and which Dr. Vidya Madala concurred in on January 24, 2002 (R. 156-63).

## D.

In his written opinion, the ALJ rejected the ME's testimony that Mr. Mangus had a condition that met or equalled an impairment level in Listing 1.04, as well as the ME's RFC assessment. The ALJ's discussion of these points is set forth below:

> The medical evidence indicates that the claimant has a back impairment, high blood pressure, and a history of marijuana and alcohol abuse – impairments that at least in combination are "severe" within the meaning of the Regulations, but that do not, even in combination, meet or medically equal any impairment listed in Appendix 1, Subpart P, Regulations No. 4. For example, the claimant's back disorder is not accompanied by signs and findings as required by Listing 1.04 and his blood pressure is under control with medication. While the medical expert was of the opinion that Listing 1.04 is met, the record fails to include the necessary findings. Indeed, claimant's testimony indicated minimal use of medication for pain and activities that are also inconsistent with disabling pain, including family grocery shopping and, until recently, cutting the grass. Further, not only are his treating physician's records not indicative of an impairment of listing level severity, but the residual functional capacity assessment of the medical expert at the hearing reflects greater limitations than even claimant testified to. For example, the medical expert opined that the claimant could only lift 5 pounds frequently, 10 pounds occasionally, and medically required a hand-held device to assist with instability. Yet, the claimant testified that he can lift 20 pounds and had only recently obtained a cane "just in case," a cane which he has not used yet.

(R. 14).

The ALJ concluded that Mr. Mangus had the residual functional capacity ("RFC") to perform work that exists in significant numbers in the economy (R. 16). As a result, the ALJ concluded that Mr. Mangus is not disabled.

## II.

We begin with a brief overview of the relevant legal standards. To establish a "disability" under the Act, a claimant must show a "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A)(2004). A claimant must demonstrate that his impairments prevent him from performing not only his past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A). The social security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520 (2004). Under this rule, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520; *see also Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or 5. A negative answer at any step other than Step 3 precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.*

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron*

v. *Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the findings of fact which are supported by "substantial evidence," 42 U.S.C. §§ 405(g) (2004), which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quotations omitted). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). *See also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Sec'y of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986) (per curiam).

That said, the Commissioner (or ALJ) is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence, and may not select and discuss only that evidence which favors his or her ultimate conclusion. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id. See also Young*, 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See, e.g., Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir. 2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). This is

especially true regarding credibility determinations, since both the case law and the regulations require an ALJ to minimally articulate the specific reasons for the credibility finding. *Zurawski*, 245 F.3d at 887. Specific reasons are required so that the reviewing Court can ultimately assess whether the ALJ's determination was supported by substantial evidence or, if not, was "patently wrong." *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

Mr. Mangus challenges the ALJ's findings at Steps 3, 4 and 5 of the sequential analysis. We begin and end our analysis with Step 3, for the reasons stated below.

### III.

A Step 3 finding requires the ALJ to determine whether a claimant's limitations (which were found severe at Step 2) meet or equal a listed disability found within 20 C.F.R. Part 404, Appendix 1, Subpt. P. At this step, the burden of proof rests with the claimant, who must show that his impairments meet or equal any impairment listed in the regulations as being so severe as to preclude substantial gainful activity. *See Young*, 957 F.2d at 389.

This Court is required to test whether an analysis at least "minimally" discusses and considers the evidence on the issue of disability, including evidence that would contradict the Commissioner's final conclusion. *Zurawski*, 245 F.3d at 888; *Clifford*, 227 F.3d at 870. As the Seventh Circuit has repeatedly held, this analysis must build an "accurate and logical bridge from the evidence to [the] conclusion." *Id.*

Mr. Mangus contends that the Step 3 analysis failed to "build an accurate and logical bridge between the evidence and the result" reached by the ALJ: that Mr. Mangus did not have an impairment that met or equalled a Listing 1.04 impairment (Pl.'s Mem. at 11). Specifically, Mr. Mangus argues that, although the ALJ found that the ME's opinion that Mr. Mangus met Listing

1.04 was not supported by the requisite signs and findings, the ALJ did not indicate which findings were missing (Pl.'s Mem. at 10-11). Mr. Mangus also argues that the reasons that the ALJ did give for finding that Listing 1.04 was not met are not supported by substantial evidence (Pl.'s Mem. at 10-11).

Each of Mr. Mangus's challenges turn on an application of the evidence to Listing 1.04, which states in relevant part:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenois, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
> or
> C. Lumbar spinal stenosis resulting in pseudocludication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04. Thus, to satisfy the requirements of Listing 1.04, the claimant must have: (1) a disorder of the spine, resulting in compromise of a nerve root or the spinal cord; an (2) symptoms that meet Subpart A, B, or C.

The ALJ offered the following reasons for rejected the ME's testimony that Listing 1.04 was met: (1) the conclusory statement that "the record fails to include the necessary findings," (2) the equally conclusory statement that Mr. Mangus's "treating physician's record [was] not indicative of

11

an impairment of listing level severity," and (c) claimant's testimony about his activities and "minimal use of mediation for pain and activities . . . are also inconsistent with disability pain" (R. 14). For the reasons stated below, we conclude that the ALJ's opinion fails to build a logical bridge between the evidence in the record and the conclusion so that a reviewing court can trace the path of the ALJ's reasoning. *See Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).

### A.

The ALJ's conclusory statement that the record lacked the "necessary findings" for the ME's opinion suffers, at the onset, from a failure to address the evidence in light of criteria in Listing 1.04. The ALJ's opinion includes no discussion of Listing 1.04's requirements, nor does it indicate whether Mr. Mangus met any or none of the Listing's requirements. This alone is a serious deficiency in the opinion. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) ("By failing to discuss the evidence in light of [the Listing's] analytical framework, the ALJ has left this court with grave reservations as to whether his factual assessment addressed adequately the criteria of the listing"). This deficiency is compounded by the ALJ's failure otherwise to explain what findings were necessary, or in what respect that were lacking. With Step 3 determinations, an ALJ must mention the specific listing that applies, and then discuss the evidence related to a claimant's alleged impairments that satisfy (or fail to satisfy) that listing. *See Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003). This, the ALJ simply failed to do.

### B.

The ALJ's reference to the record of the treating physician is also conclusory. We are left to wonder what in that record the ALJ had in mind, or how it was inconsistent with Listing 1.04. The Seventh Circuit has consistently held that an ALJ cannot reject a doctor's medical conclusion

12

without other evidence, *see Clifford*, 227 F.3d at 869-70; nor can an ALJ draw medical conclusions about a claimant without relying on objective medical evidence elsewhere in the record. *See, e.g., Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000). The ME testified that there was objective medical evidence to support a finding of disability at Step 3 under Listing 1.04 (*e.g.*, an MRI showing degenerative disk disease of the lumbar spine, manifesting itself "particularly with neurological findings at L-5, S-1 in the form of a[n] absent right ankle jerk" and a "one half-inch atrophy of the right calf" as well as numbness in the fifth toe) (R. 53). The ME also noted that Mr. Mangus's complaints of pain followed a "typical pain pattern" for such a condition (*i.e.*, "pain sitting and standing, which comes and goes") (R. 53). The ME further found that Mr. Mangus would eventually need back surgery (*i.e.*, a "diskectomy" and a "lumbosacral fusion"); that he would not get his reflex or atrophy back; and that the numbness would never go away (R. 53-54).

"[P]roper resolution . . . requires that the ALJ [the claimant's] proffered medical evidence and articulate specific reasons for accepting or rejecting it. After doing so, he must discuss his factual findings in light of [the listing]." *Scott*, 297 F.3d at 596. If the ALJ wished to reject the ME's testing based on something in the treating physician's record, it was incumbent on him to explain what in that record undermined the ME's testimony. The ALJ failed to do so.

### C.

Finally, the ALJ's reference to Mr. Mangus's testimony about his infrequent use of pain medication, and his level of activities, is insufficient – at least without more – to serve as a basis for rejecting the ME's testimony. *First*, the ME made clear that Mr. Mangus's description of his pain is consistent with the objective medical evidence of his condition (R. 53-54). *Second*, the ALJ fails to explain how his view of Mr. Mangus's level of pain and activity precludes application of Listing

13

1.04, because the ALJ never cites the Listing or discusses the evidence "in light of [its] analytical framework." *Scott*, 297 F.3d at 595.

## CONCLUSION

In summary, we find that the deficiencies in the ALJ's Step 3 analysis require a remand in this case. We express no view as to what the ultimate outcome should be on remand in the Step 3 analysis. We also express no view on the challenges to the ALJ's findings at Steps 4 and 5. We leave it open for the ALJ, on remand, to take new evidence and reconsider all aspects of the case.

Accordingly, the Commissioner's motion for summary judgment (doc. # 14) is denied and Mr. Mangus's motion for summary judgment (doc. # 11) is granted. This case is remanded pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Order.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: July 23, 2004